## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEGAN DANESHRAD, individually, and on behalf of similarly situated female employees,<br><br>     Plaintiff,<br><br>  v.<br><br>MOSES & SINGER LLP, DEAN SWAGERT, in his personal and professional capacities, DAVID LACKOWITZ, in his personal and professional capacities, PAUL RODER, in his personal and professional capacities, and PHILIPPE ZIMMERMAN, in his personal and professional capacities.<br><br>     Defendants. | Index No: 1:23-cv-11056<br><br>**Complaint, Collective Action**<br><br>**<u>Jury Trial Demanded</u>** |

Plaintiff Megan Daneshrad, represented by Seppinni Law, alleges based on information and belief at all relevant times:

### <u>PRELIMINARY STATEMENT</u>

1. Moses Singer terminated Ms. Daneshrad, a partner at the law firm, shortly after she requested pregnancy medical accommodations in writing for severe morning sickness, received none, and then tragically lost her pregnancy.

2. Ms. Daneshrad faced systemic gender discrimination at Moses Singer throughout her tenure, pervaded by unequal pay, sexual harassment, unfavorable work assignments, and an ultimately discriminatory and retaliatory termination in October 2023.

3. Ms. Daneshrad repeatedly brought the discrimination she experienced to the firm's attention but was met with indifference and victim-blaming by Moses Singer's senior leadership, including Managing Partner Dean Swagert, Litigation Co-Chair David Lackowitz, and Litigation Co-Chair Philippe Zimmerman.

1

4.      Despite regularly expressing her interest in substantive work, Ms. Daneshrad was consistently overlooked in favor of junior male attorneys, creating a pattern of discriminatory work assignment practices.

5.      After Ms. Daneshrad volunteered for trial experience that male associates junior to her were given, Defendant Philippe Zimmerman instead sent her to the doldrums of fee arbitrations, which Moses Singer brings against its clients.

6.      Upon disclosing her first pregnancy to Moses Singer, Ms. Daneshrad faced increased discrimination, and then received even fewer substantive work opportunities. The hostility toward her based on gender, sex, family status, and pregnancy status escalated during her maternity leave with defendants demanding her presence at the office during her maternity leave for trivial matters.

7.      Upon return from maternity leave, Plaintiff kept facing biased treatment, including disparaging comments about the leave she took, discriminatory performance evaluations, and unjustified denial of substantive work assignments. In one interaction, a male colleague told Ms. Daneshrad, **"Go back to being a good mommy,"** after she had assisted with a client matter outside of work hours while sick with RSV and caring for her ill infant simultaneously. Rather than be heralded for this feat, Ms. Daneshrad was mocked for being a working mother. When Ms. Daneshrad reported this incident to a colleague, the colleague told her that the same lawyer had made an identical comment to her, that she had complained to Managing Partner Dean Swagert, and that Mr. Swagert had done nothing in response.

8.      Once fully back from maternity leave, HR led Ms. Daneshrad to a storage room littered with junk without adequate space for a breast pump and her belongings. This would be the

first and last time that any mother, Ms. Daneshrad or otherwise, would step foot in Moses Singer's storage-closet-turned-lactation-room, to Ms. Daneshrad's knowledge.

9.      On top of failing to accommodate Ms. Daneshrad after her first pregnancy, Ms. Daneshrad's written request for medical accommodations in response to serious pregnancy complications during her second pregnancy went unanswered by Defendant. Ms. Daneshrad tragically lost her second pregnancy shortly after requesting accommodations and receiving none.

10.     Despite her dedication to Moses Singer, Defendants terminated Plaintiff without notice shortly after she returned from surgery for a dilation and curettage (D&C) necessitated by pregnancy complications. This is among the most traumatic and tragic things an expecting mother can experience.[1] The procedure took place on a Friday, yet Ms. Daneshrad worked throughout the weekend in response to Defendants' demands while she was meant to be out on leave recovering physically and mentally. Even this extreme level of dedication by Ms. Daneshrad was not enough to satisfy Defendants.

11.     Beyond the horrible conditions Ms. Daneshrad experienced during and after her pregnancies, she also endured a pervasive hostile work environment, exemplified by incidents involving senior partners Alan Kolod, Paul Roder, and another senior male partner.

12.     Mr. Kolod, for example, disrobed down to his underwear in front of Ms. Daneshrad during a client outing.

13.     A colleague in attendance was so shocked by Mr. Kolod's disrobing in front of Ms. Daneshrad that afterward this colleague pulled her aside and asked if she was okay.

14.     She was not "okay."

---

[1] Ms. Daneshrad does not allege that Defendants' actions led to her pregnancy loss, but Moses Singer's callous failure to accommodate, and Defendants' termination of Ms. Daneshrad shortly after losing her pregnancy, led to immeasurable unnecessary suffering by Ms. Daneshrad in addition to the personal tragedy she experienced.

15.     Ms. Daneshrad, like every other working woman, deserved to attend a client outing at work without having to stand by while senior men behaved inappropriately at no personal cost to their careers.

16.     Mr. Roder, for his part, made unwanted advances toward Ms. Daneshrad. In one incident, Mr. Roder grabbed Plaintiff by the arm at a firm summer party and commented on her "guns'" shapeliness. This type of behavior created an environment of sexual harassment, fear, and humiliation for Plaintiff. Ms. Daneshrad texted a third party that evening saying she was hiding behind a column from Mr. Roder while awaiting a taxi.

17.     In further evidence of the environment women at Moses Singer experience, it was reported to Plaintiff that a senior male partner, who has been the subject of complaints by women at Moses Singer, engaged in an affair with a junior female lawyer at the firm. It was reported to Plaintiff that this junior lawyer was promoted to partner during the affair, sending a clear message to other women lawyers at the firm about one avenue for advancement available to women. This female lawyer has since left the firm after employees reported seeing her significant other arrive at Moses Singer's office and punch the senior male partner in the face.

18.     Mr. Kolod, Mr. Roder, and the other senior male lawyer's misconduct reveal a broader pattern of sexual harassment, contributing to a hostile workplace that permeates Moses Singer.

19.     After firing Ms. Daneshrad without notice, Defendants, in evidence of their guilt, attempted to buy Ms. Daneshrad's silence. Prior to Ms. Daneshrad hiring a lawyer, Defendants offered Ms. Daneshrad an insulting less than four months salary of her already discriminatorily low pay, in return for her signing an agreement that she would not speak disparagingly about Moses Singer and members of the firm who had harassed and wronged her.

20.     Ms. Daneshrad refuses to let Moses Singer silence her.

### THE PARTIES

21.     Plaintiff Megan Daneshrad is a resident of the City and State of New York and was employed by Defendants in New York City from June 2014 through October 2023. At all relevant times she was an "employee" within all applicable statutes.

22.     Defendant Moses & Singer LLP is a law firm with its principal place of business at The Chrysler Bldg., 405 Lexington Avenue, New York, NY 10174. At all relevant times, Moses Singer was an "employer" or "covered employer" within the meaning of all applicable statutes.

23.     Defendant Dean Swagert is a resident of New York, and the Managing Partner of Defendant Moses Singer. At all relevant times, Mr. Swagert was employed by Moses Singer and met the definition of an "employer" or "covered employer" under all applicable statutes.

24.     Defendant David Lackowitz is a resident of New York, and the Co-Chair of Defendant Moses Singer's Litigation Department. At all relevant times, Mr. Lackowitz was employed by Moses Singer and met the definition of an employer or covered employer under all applicable statutes.

25.     Defendant Paul Roder is a resident of New York, and the Co-Chair of Defendant Moses Singer's Banking & Finance Practice Group. At all relevant times, Mr. Roder was employed by Moses Singer and met the definition of an employer or covered employer under all applicable statutes.

26.      Defendant Philippe Zimmerman is a resident of New Jersey, and the Co-Chair of Defendant Moses Singer's Litigation Department. At all relevant times, Mr. Zimmerman was employed by Moses Singer and met the definition of an employer or covered employer under all applicable statutes.

## JURISDICTION

27.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

28.     The Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

30.     Before commencing this action, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 17, 2023. Plaintiff will file an amended complaint to include claims requiring a Notice of the Right to Sue, including under Title VII of the Civil Rights Act of 1964 (Title VII), the Americans with Disabilities Act (ADA), the Pregnancy Discrimination Act (PDA), and the recently enacted Pregnant Workers Fairness Act (PWFA).

31.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within 10 days of its filing, thereby satisfying the notice requirements of this action.

32.     Under NYLL § 215(2)(b), Plaintiff will serve a copy of this Complaint on the New York Attorney General, thereby satisfying the notice requirements of this action.

33.     All other prerequisites to filing this suit have been met.

## FACTUAL ALLEGATIONS

**I.    Ms. Daneshrad's Employment with Moses Singer**

34.    Ms. Daneshrad joined Moses Singer in June 2014 as an associate after a nearly five-year stint at a larger law firm. During 2020, Moses Singer "promoted" Ms. Daneshrad to income partner.

35.    The firm agreed to pay Ms. Daneshrad a $260,000 salary, bonus, and benefits. Even so, Ms. Daneshrad never received a bonus following her promotion to income partner and was paid less than even some male lawyers at the firm on account of her gender.

36.    Defendants' "promotion" of Ms. Daneshrad was in name only.

37.    In December 2019, the firm promoted some of Ms. Daneshrad's classmates in the litigation department to Of-Counsel. Defendants had never once discussed Ms. Daneshrad's path to Of-Counsel with her, so she expressed her surprise and concern and threatened to leave the firm.

38.    Defendants then gaslit Ms. Daneshrad, telling her that it was somehow *good* that she had been passed over for promotion to Of-Counsel because the firm wanted to promote her straight to partner.

39.    Defendants concocted this ruse after the fact to keep Ms. Daneshrad at Moses Singer without ever intending to open the door of equity partnership to her. Ms. Daneshrad would come to learn that this was part of a pattern and practice by Moses Singer of reserving equity partnership almost exclusively to men. As of this filing, on information, **the firm has over 170 employees, 40 male partners, and just three women equity partners**. This represents a female equity partnership of roughly one and a half percent.

40.    Defendants illegally terminated Ms. Daneshrad in October 2023.

**II.   Ms. Daneshrad's Repeated, Unanswered Requests for Substantive Work and Her Protected Complaints of Gender Discrimination**

41.     On or about January 11, 2019, Ms. Daneshrad began making protected complaints alleging favoritism in staffing toward male lawyers at the firm. She kept making similar complaints throughout the remainder of her time at Moses Singer.

42.     For example, Ms. Daneshrad wrote to David Lackowitz, "After we get this brief in on Monday I would like to discuss my staffing." She followed up this email on June 6, 2019, writing to Mr. Lackowitz, in part:

> "...I'm not happy about the work that I've done over the past 6 months, especially in light of what happened in December and the discussion that we had then [regarding being passed over for promotion to Of-Counsel]. I feel like **I'm still, for the most part, getting less desirable work than some of the male associates more junior to me**. I was told my lack of promotion was a good thing . . .. Then, when I've been slow lately and asked for work, for instance, **I've received one-off research assignments from the corporate and trusts and estates department that a first year could have done.** When I speak to other associates I hear about mediations, arbitrations, [and] oral arguments. I feel like I am intentionally receiving mixed messages - you're doing great, we want to give you a better promotion/the only work anyone here wants you to do is research assignments." (emphasis added).

43.     Defendants did not investigate Ms. Daneshrad's protected complaints.

44.     Nor did Defendants address her underlying concerns.

45.     Instead, Defendants hastily "promoted" Ms. Daneshrad to income partner to mollify her.

46.     But Defendants' "promotion" of Ms. Daneshrad was actually a punishment and effectively a pay cut.

47.     Income partners at Moses Singer—the overwhelming majority of whom on a per capita basis, if not in total, are women as compared to the equity partnership where nearly all are men—are stripped of firm-provided health insurance benefits without receiving firm equity and a real say in firm management in return.

48.     In fact, Ms. Daneshrad was never presented with a partnership agreement, unlike men who are equity partners at the firm.

49.     Following her "promotion," Moses Singer's discrimination in assignments and pay continued unabated.

50.     Then, on July 10, 2019, Ms. Daneshrad disclosed that she was diagnosed with shingles due to workplace stress and emailed HR requesting accommodations and guidance.

51.     Later that month, Ms. Daneshrad informed Moses Singer that she was diagnosed with a thyroid disorder and might need to take some time off.

52.     But she never took this time off because she reasonably feared she would be penalized for doing so under Moses Singer's discriminatory and retaliatory policies and practices that dock employees for each billable hour not worked while on protected leaves for bonus eligibility and promotion.

53.     This policy disproportionately impacts women and disabled employees who take protected leaves.

54.     Ms. Daneshrad would reach out to David Lackowitz in writing no fewer than three times in the first half of 2020, together with many phone calls, requesting the types of substantive assignments that her junior male peers received to no avail.

55.     This continued in 2021.

56.     On January 11, 2021, Ms. Daneshrad wrote in response to David Lackowitz's January 8, 2021 outreach gauging litigation partners' work capacities, "[]I'm still looking for work."

57.     Yet she was excluded from substantive work despite David Lackowitz's January 8, 2021 email confirming that there was much work that needed to be assigned.

9

58.     This gender-based favoritism in assignments continued throughout Ms. Daneshrad's tenure at the firm.

59.     For example, Ms. Daneshrad had taken the lead on drafting an appeal brief for the firm in the First Department. Though the case settled before the appeal was perfected, Defendants had determined that Robert McFarlane, a man junior to Ms. Daneshrad, would stand up in court and argue the appeal should it proceed.

60.     Ms. Daneshrad texted to a colleague at the time, "Of course he [David Lackowitz] was going to let McFarlane argue it." To which Ms. Daneshrad's colleague responded in recognition that Ms. Daneshrad was unfairly passed over because of her gender, "You're kidding me?!!! What?"

61.     When Ms. Daneshrad complained of being passed over in favor of men internally, a colleague wrote to her, "He [David Lackowitz] really showcases how bosses can form their mini-me's and often not for the best," regarding the above gender and sex discrimination incident.

62.     Another example of gender discrimination against Ms. Daneshrad in favor of her junior male colleagues involved the determination of who would lead the firm's Section 1782 work.

63.     From the fall of 2019 until right before Ms. Daneshrad's son was born in the summer of 2021, Moses Singer Partner Toby Butterfield and Ms. Daneshrad opposed an aggressively litigated Section 1782 application for discovery for use in a foreign proceeding.

64.     Ms. Daneshrad did all the drafting—she successfully opposed the application, the motions for reconsideration, to renew, and to reargue. But Toby Butterfield, the man who felt "abandoned" by Ms. Daneshrad because she took maternity leave (*infra* at ¶¶ 100-112), conducted the oral argument rather than Ms. Daneshrad.

65.     Then, after the birth of her son, Ms. Daneshrad attended a department-wide litigation lunch where she learned that Defendants had decided that Of-Counsel Robert McFarlane would become the firm's point-of-contact on Section 1782 matters.

66.     Mr. McFarlane would receive the firm's support to market Defendant's expertise in that area, and he would be the designated client contact for such work.

67.     Mr. McFarlane had nowhere near the years of Section 1782 experience that Ms. Daneshrad had, yet she was never considered for this designation because of her gender.

68.     Mr. McFarlane had not even applied for this important business development opportunity before receiving it over Ms. Daneshrad.

69.     Nor had Ms. Daneshrad been informed that the opportunity existed.

70.     In yet another instance of Moses Singer refusing to give Ms. Daneshrad substantive opportunities because of her gender and parental status, Ms. Daneshrad recently drafted the bulk of an appeal for a case. Even so, when the time came to select who would argue the appeal, Ms. Daneshrad, the lead drafter, and most involved attorney on the case, was passed over for the opportunity in favor of a male partner.

71.     Rather than select Ms. Daneshrad for the trial experience she repeatedly expressed interest in, roughly two months before her termination, Defendant Philippe Zimmerman walked into Ms. Daneshrad's office and explained that the firm was assigning her to handle fee arbitrations against the firm's clients that have stopped paying Moses Singer's bills.

72.     Fee arbitrations are among the least desirable assignments to which a lawyer can be assigned.

73.     Rather than build a positive relationship with clients, women lawyers tasked with litigating fee arbitrations, such as Ms. Daneshrad, are put into a non-billable adversarial posture against clients that failed to pay their legal fees.

74.     Philippe Zimmerman, Litigation Co-Chair, told Ms. Daneshrad that fee arbitrations would be a good way for her to get "low stakes" trial experience.

75.     Philippe Zimmerman told Ms. Daneshrad that the junior male Of-Counsel who had once handled the many fee arbitrations Moses Singer brings against its clients was "busy with billable work."

76.     Defendant Philippe Zimmerman reserved "high stakes" trial experience for men.

77.     For example, on March 20th of this year, Philippe Zimmerman boasted of a trial victory where the "team in the courtroom" was 100% male, and the support team "back in the office (and/or at home)" was 50% female, according to Mr. Zimmerman's email.

78.     Even junior male attorneys, such as Z.S., were selected for prime "high stakes" trial experience over Ms. Daneshrad on account of her gender.

79.     For example, David Lackowitz tried a case in 2020 with then-associate Z.S.

80.     In a post-trial email boasting about a victory on a motion for attorneys' fees, David Lackowitz praised Mr. Z.S. for "routinely work[ing] throughout nights and over weekends . . .[,]" something working mothers at the firm like Plaintiff were disproportionately not entrusted with on "high stakes" billable trials.

81.     This is part of a pattern at Moses Singer in which men are put on a pedestal and women, even the senior-most women at the firm, are treated as second-class employees.

### III.   Discriminatory and Retaliatory Treatment of Ms. Daneshrad After She Requests, Takes, and Returns from Maternity Leave

82.    Less than two weeks after asking for substantive work and receiving none in January 2021, Ms. Daneshrad informed Therese Cesaro (HR), Dean Swagert (Managing Partner), and David Lackowitz (Co-Chair of Litigation Dept.) that she was "pregnant and due in July."

83.    Once Ms. Daneshrad disclosed her pregnancy, opportunities for substantive work became even scarcer.

84.    In response to a February 16, 2021 email requesting more work from David Lackowitz, Mr. Lackowitz wrote to Ms. Daneshrad, "Ok, thanks for letting me know. In the meantime, think about who you can reach out to. Articles to write. CLEs to present. And if I hear anything, I'll let you know (although I know there are others looking too)."

85.    "Others [were] looking too," and to Defendants, "others" deserved substantive billable work more than Ms. Daneshrad did on account of their gender and pregnancy status.

86.    This discrimination against Ms. Daneshrad continued and became even more obvious.

87.    On June 15, 2021, David Lackowitz sent an email saying, "If anyone is looking for work and can run a new matter, please let me know."

88.    Ms. Daneshrad volunteered, writing "I have plenty of time if it's something that's appropriate for me."

89.    But David Lackowitz replied, "We missed you at the last dept. meeting [which Ms. Daneshrad had missed due to her pregnancy]. This is likely a new litigation and **given you're going to be out on leave soon, I'm not sure it makes sense to have you run it.**"

90.    Defendants assumed Ms. Daneshrad could not take on new assignments because of her pregnancy status.

91.     Ms. Daneshrad, seeing the writing on the wall, dejectedly replied, "I guess an ongoing project like that doesn't make sense at this point, but please keep me in mind for shorter projects. I'll be around for another month or so."

92.     David Lackowitz did not assign Ms. Daneshrad *any* new substantive work between then and the start of her maternity leave because of her protected leave and pregnancy status.

93.     Once Ms. Daneshrad was out on maternity leave, however, the firm sent the clear message that her maternity leave came second to even the most trivial firm matters.

94.     For example, while out, the firm required Ms. Daneshrad (who was recovering from childbirth) to come in person to have her headshot taken or else she would not be permitted to have her photo and bio up on the firm's relaunched website.

95.     Ms. Daneshrad begrudgingly complied and went into work while on her maternity leave during the height of COVID-19 and while caring for a vulnerable newborn.

96.     To do otherwise would have harmed her career and ability to generate business at the firm.[2]

97.     Despite Defendants ignoring Ms. Daneshrad's legally protected right to maternity leave when it suited them, Ms. Daneshrad returned to work eager to contribute.

98.     On October 28, 2021, Ms. Daneshrad told David Lackowitz and Philippe Zimmerman, "I'm officially back from maternity leave and don't have much on my plate right now.  Please keep me in mind for staffing."

---

[2] Ms. Daneshrad is not the only female lawyer at Moses Singer who was required to work during her legally protected maternity leave. Defendants required R.A. to work through not one but two maternity leaves before she left the firm after experiencing pregnancy and gender discrimination. And Ms. Daneshrad is far from the only woman at the firm to suffer mistreatment on account of her gender.

99.     Then, again, on January 4, 2022, Ms. Daneshrad asked to be kept "in mind for staffing" and shared that she was getting up to speed in anticipation of covering for another colleague's maternity leave but "definitely [had] time to take on additional work."

100.    These repeated requests for substantial assignments were futile.

101.    On April 22, 2022, Ms. Daneshrad had a "check-in" meeting with David Lackowitz and Dean Swagert via Zoom. Mr. Lackowitz and Mr. Swagert noted that Ms. Daneshrad's hours were tracking less than the required amount, but that her hours had improved since her last review.

102.    This comment illustrates Defendants' illegal policy under which women who take leave are penalized rather than having their hours and bonuses pro-rated to account for their time out on protected leaves.

103.    Both Dean Swagert and David Lackowitz relayed that Toby Butterfield had expressed concerns that Ms. Daneshrad had "abandoned" him and "the team" when she was on leave.

104.    Dean Swagert then compared Ms. Daneshrad, who sometimes worked from home to cover when her son's childcare fell through during the pandemic, to another woman at the firm whom he liked because he "always knows where she is and what she's doing."

105.    Men at the firm were not required to submit to this level of micromanagement to remain in Managing Partner Dean Swagert's good graces. Ms. Daneshrad and her colleague were because of their gender.

106.    In an email to David Lackowitz and Dean Swagert sent on April 22, 2022, Ms. Daneshrad followed up on their "check-in" by making another protected complaint to the senior partners:

"I want to clarify that I had to speak to Therese [read: HR] about how to deal with Toby **when I was pregnant because he questioned whether I was 'really**

unavailable' for an oral argument[3] as a result of a medical procedure, or merely making excuses because I didn't want to do it. (I ultimately rescheduled the argument for a time when I was available–I wasn't trying to avoid it). [**Toby Butterfield] also pressured me to disclose to the client that I was pregnant before I was comfortable doing so, which I did to placate him**. That's the background on which I'm so upset by Toby's feelings of 'abandonment.'" (emphasis added).

107.     Defendant pressured Ms. Daneshrad to disclose her pregnancy to clients when she did not wish to.

108.     Ms. Daneshrad faced the catch-22 that working women experience all too often in male-dominated workplaces like Moses Singer: withhold details of a pregnancy and risk being seen as duplicitous or disclose pregnancy early and risk being ostracized by men who view their colleagues' pregnancies as inconveniences.

109.     Ms. Daneshrad's serious written complaints both to HR and Defendants Dean Swagert and David Lackowitz constitute protected complaints under federal, state, and local law.

110.     Defendants failed completely to investigate Ms. Daneshrad's complaints, a theme that would continue to repeat itself.

111.     Instead, when Ms. Daneshrad complained to HR regarding Toby Butterfield's discriminatory behavior, HR first told her, "That doesn't sound like Toby," and then stated that "This sounds like something you and Toby can work out amongst yourselves."

112.     Dean Swagert and David Lackowitz, after learning that their subordinate, Toby Butterfield, had pressured their partner, Ms. Daneshrad, to disclose her pregnancy status to benefit him, did nothing other than continue to squeeze Ms. Daneshrad out from career advancement at Moses Singer.

---

[3] This was not the oral argument on the merits of the application, which is referenced *supra*, but involved an ancillary matter related to one of the subsequent motions for reconsideration.

113.    Still, on no fewer than three occasions between July 25, 2022, and August 8, 2022, Ms. Daneshrad eagerly sought out additional opportunities for billable work from the people who had retaliated against her post-partum.

114.    Evidence of this retaliation can be seen in the number of billable hours Ms. Daneshrad billed before her pregnancy and in the year after her return from leave. This is an all-too-common illegal occurrence in male-dominated professional workplaces like Moses Singer. So much so, that a disproportionate number of new mothers have left Moses Singer shortly after returning from protected leave or experiencing gender or pregnancy discrimination including, R.A. and K.H.

115.    In one particularly disturbing incident after Ms. Daneshrad's return from leave, attorney Robert Wolf insisted that Ms. Daneshrad conduct a matrimonial consult on a Saturday while Ms. Daneshrad was out sick caring for her son and herself—both of whom had contracted RSV.

116.    Ms. Daneshrad, ever the committed colleague, complied.

117.    At the end of the call, Robert Wolf told Ms. Daneshrad to "**Go back to being a good mommy**."

118.    When Ms. Daneshrad told a colleague about this interaction, her colleague wrote, "He said the exact same thing to me when I was on maternity leave," and "[o]ne of the worst things about it, I think, is that I told Dean [Swagert] and Therese [Cesaro] something afterwards . . . and yet the exact thing happens."

119.    This illustrates that Moses Singer's leadership was aware of an existing pattern and practice of caretaker status discrimination and of interfering with women on protected leaves, and yet they did nothing to intervene.

120.    Firm ownership and HR knew that their employees treated working mothers this way yet failed to do anything to stop them.

121.    The environment for women and working mothers at Moses Singer is so hostile that in response to Ms. Daneshrad telling her colleague, another female income partner, that she wouldn't be able to get to a request until later that afternoon due to a childcare issue, the colleague wrote: "I'm sure this has been such a crazy time for you. Thank you again for all of your effort on this," and "[o]ne of these days, the world will figure out how to actually help working mothers, well, WORK!"

122.    One need look no further than the firm's legally deficient "lactation room" (pictured below) for a glaring example of how Defendants failed to "help working mothers, well, WORK," and instead treated them as second-class employees:



123.    Defendants published no lactation room written policy.

124.    Defendants distributed no lactation room policy.

125.    In fact, Defendants published no employee handbook whatsoever.

126.     In yet another example of how Defendants treat women as second-class employees, unlike men who are equity partners at the firm, Plaintiff was never offered or asked to sign a copy of the firm's partnership agreement.

127.     This is because the firm never viewed Plaintiff as a part of the boys' club that is the Moses Singer partnership.

**IV.     Ms. Daneshrad's Unanswered Requests for Pregnancy Medical Accommodations, and her Termination Shortly After Returning from Surgery**

128.     On June 5, 2023, Ms. Daneshrad emailed Therese Cesaro to request medical accommodations and inform her that she was pregnant with her second child.

129.     Ms. Daneshrad told Therese Cesaro, "**I'm very sick–unable to keep anything down** . . .. I'm working with my doctor of course, but what do I do about work in the meantime? I don't want to let the ball drop on anything, but I'm definitely not able to put in my typical hours or effort when I'm this sick."

130.     Ms. Cesaro, **Defendant's HR executive, never responded**.

131.     Ms. Cesaro was Moses Singer's only HR person.

132.     She worked from South Carolina.

133.     Moses Singer's only office is in New York City.

134.     After not receiving a response from Defendants, Ms. Daneshrad reached out to a colleague, "I reached out to Therese because I'm still super sick and worried about deadlines. Radio silence[.] **I don't understand why we even pretend to have HR.**"

135.     Roughly two weeks later, after not receiving accommodations nor even a semblance of an interactive process, Ms. Daneshrad tragically lost her child due to pregnancy complications.

136.    Ms. Daneshrad informed David Lackowitz that beginning Friday, June 23, 2023, she would be out for surgery for that weekend and back at work on Monday, June 26, 2023, without sharing what for.

137.    She stated that she would need to work from home for two weeks to recover from surgery and handle follow-up medical appointments.

138.    On June 20, 2023, Ms. Daneshrad also informed Howard Fischer that she would be out on Friday of that week due to serious medical issues and surgery.

139.    Ever the committed employee, Ms. Daneshrad kept working through the date of her surgery, responding to emails as they arose—again showing the firm's total disregard for Ms. Daneshrad's protected leave, serious medical procedures, and conditions.

140.    Just a few short months after notifying Moses Singer that she was pregnant, and soon after notifying the firm she would be out due to a surgery, Defendants fired Ms. Daneshrad without notice.

141.    One of two things happened. Either Defendants fired Ms. Daneshrad while under the belief that she was pregnant and would soon take legally protected maternity leave again. Or Defendants knew that Ms. Daneshrad's surgery was related to her pregnancy and fired her right afterwards regardless. Either explanation indicates Defendants' disregard for the law and Ms. Daneshrad's humanity.

142.    The firm cannot say that Ms. Daneshrad's work product was the cause of her termination.

143.    On or about September 7, 2022, David Lackowitz stated regarding a brief that Ms. Daneshrad spearheaded, "I thought the brief was terrific. . . I thought you all did a nice job . . .."

144.    In another instance of praise for Ms. Daneshrad's recent work product, David Lackowitz stated, "I think it's terrific and am fully drunk on the Kool-Aid."

145.    Neither can Defendants claim that a slow-down in available work led to Ms. Daneshrad's termination.

146.    Despite the firm pressuring Ms. Daneshrad into taking on work in matrimonial law instead of giving her substantive assignments within the male-dominated litigation department, much of Ms. Daneshrad's time was spent on civil litigation matters.[4] Her firm bio listed her as a member of the civil litigation department, and the firm has recently posted job postings to hire more civil litigators.

147.    In fact, at a litigation department lunch that Ms. Daneshrad attended just an hour before her termination, the firm noted that the litigation department was short-staffed because of Robert McFarlane and E.S.'s paternity leaves and P.M.'s extended honeymoon,[5] and that everyone should be prepared to pick up additional work in the coming weeks.

148.    Everyone except for Ms. Daneshrad, as she soon learned for the last time.

**V.    The Ongoing Hostile Work Environment at Moses Singer**

**a.    <u>Then-Chairman Alan Kolod Takes His Pants Off in Front of Ms. Daneshrad on a Client's Boat</u>**

149.    Ms. Daneshrad's tenure at Moses Singer was a continuing discriminatory and hostile work environment.

---

[4] Plenty of matrimonial law work existed too, as evidenced by Defendants comments during her termination regarding how the matrimonial matters and clients she worked on or led would be handled following her departure.

[5] Defendants permitted men who took protected leaves to continue advancing their careers at Moses Singer, unlike women.

150.     For example, while in San Francisco for an arbitration, former Moses Singer Chairman Alan Kolod took his pants off, down to his underwear, in front of a shocked Ms. Daneshrad and others during an afternoon outing on a client's boat.

151.     After the arbitration and Moses Singer's win, Mr. Kolod's assistant emailed a group of employees including Ms. Daneshrad and Mr. Kolod reminding everyone of the "dress code" for a celebration dinner.

152.     An email recipient had been in San Francisco for the arbitration and had learned about Mr. Kolod's disrobing.

153.     This email recipient forwarded the dress code email to Ms. Daneshrad and commented: "Just so you know, I was very tempted to reply all 'Do they permit bathing suits?" in clear reference to Mr. Kolod's disrobing.

**b.     Partner Paul Roder Drunkenly Grabs Ms. Daneshrad Without Her Consent**

154.     Paul Roder, at a work event on or about July 21, 2022, also behaved in ways that give rise to liability for sexual harassment by Defendants.

155.     At the event, when Ms. Daneshrad tried to leave, Management Committee Member Paul Roder drunkenly hugged her to prevent her from leaving and insisted that she stay for the after-party.

156.     It was widely known by women at the firm that Paul Roder behaved this way towards women at the firm when he drank.

157.     Paul Roder was a member the firm's management committee at the time.

158.     Ms. Daneshrad, seeing no other option, agreed to attend the after-party.

159.     At the after-party, Paul Roder grabbed Ms. Daneshrad's bare arm without her consent and made gender-based comments about the size and shape of Ms. Daneshrad's "guns" compared to his arms.

22

160.    Men at the firm were not subject to this mistreatment.

161.    After being grabbed by Mr. Roder, Ms. Daneshrad left the after-party humiliated.

162.    Ms. Daneshrad texted a third party to say that she was "legit hiding behind a column" from Paul Roder, waiting for her taxi.

163.    Ms. Daneshrad's repeated presence during these bizarre episodes became a cruel running joke in the firm.

164.    When one client was accused of being creepy internally, a Moses Singer employee joked, "Oh someone is being creepy? We should staff [Megan] on that matter."

## COLLECTIVE ACTION ALLEGATIONS[6]

165.    Ms. Daneshrad alleges claims under the Equal Pay Act on both an individual basis and on behalf of a collective of women lawyers who have been, are now, or will be employed by Moses Singer in New York at any time during the applicable liability or statute of limitations periods, through the date of any judgment in this case ("EPA Collective"). This collective, upon information and belief, consists of more than 40 female attorneys.

166.    The discriminatory employment practices that disproportionately affect women attorneys at Moses Singer and cause them to be paid less than similarly situated men at the firm exist in connection with subjective decision-making about:

- Compensation, including hourly pay, salary base pay, discretionary bonuses, and equity;

- Hiring;

---

[6] The First Cause of Action in this Complaint is being prosecuted as a collective action pursuant to the Equal Pay Act, 29 U.S.C. § 206 *et seq*. Ms. Daneshrad incorporates by reference the allegations from the preceding paragraphs, including those alleging common patterns, practices and/or policies by Moses Singer resulting in unlawful discrimination and retaliation, as if fully set forth herein. The Collective Allegations are also incorporated by reference in the Factual Allegations.

- Development;

- Advancement;

- Opportunities for mentorship;

- Promotions;

- Work assignments;

- Level of responsibility;

- Client introductions;

- Client pitches;

- Opportunities to socialize free from harassing and stigmatizing behavior at company and client events;

- Internal committee appointments and the exclusion from such committees;

- Practice group assignments and the exclusion or inclusion in certain practice groups;

- Failing to prevent, address, investigate, or take remedial action regarding claims of discrimination against women lawyers; and

- Terminations, including through layoffs.

167.    The subjective decision making about the items above regularly involves bias and unconscious bias by the individuals at Moses Singer with the authority to render such decisions.

168.    As a result, the systemic discriminatory practices that disproportionately affect women lawyers' compensation as compared to similarly situated men at Moses Singer include, *inter alia*:

- Discretionary hiring practices that disfavor women lawyers;

- Discretionary compensation policies that disfavor women lawyers;

- Discretionary performance evaluation systems that disfavor women lawyers;

- Discretionary promotion systems that disfavor women lawyers; and

- Discretionary termination practices that disfavor women employees.

169.    This discrimination is perpetuated by Moses Singer's ongoing failure to prevent, address, investigate, or take remedial action when women lawyers at the firm complain about discrimination.

170.    Moses Singer has repeatedly failed to prevent, address, investigate, or take remedial action when other women lawyers report incidents of sex and gender bias, or incidents that suggest sex or gender bias.

171.    As set forth in this Complaint, based on the inexplicable, wide gap in representation of women at the partnership and especially equity partnership levels (together with the specific complaints of Ms. Daneshrad and other women lawyers), Moses Singer was on notice but failed to act to remedy the blatant sex and gender discrimination.

172.    Moses Singer claims that "the Firm's culture and policies value the unique abilities and perspectives of every individual and support diversity in its broadest sense, including [] gender . . .," but the reality beyond this website-marketing platitude is that only those in leadership positions, mostly male lawyers, have authority at Moses Singer to make meaningful client contacts, participate beyond a superficial token level in client pitches, take on meaningful trial experience, and be represented and taken seriously in meetings where these decisions are made.

173.    Without the same access to opportunities to secure new business, gain real trial experience, and maintain client relationships, as are given to male attorneys, the perpetual state of lower compensation, unpaid or lower bonuses, lack of access to promotion, including to equity

partnership, and diminished opportunities for future employment is the abhorrent reality for women attorneys at Moses Singer.

174.    Such systemic failures allow senior male lawyers at the firm to perpetuate gender and sex discrimination against women lawyers at the Associate, Of-Counsel, and Partner levels that has and continues to cause them to experience the following, *inter alia*:

- Unequal base salary for substantially the same work as compared to male lawyers;

- Unequal performance evaluations as compared to male lawyers;

- Unequal bonuses for substantially the same work as compared to male lawyers;

- Unequal equity for substantially the same work as compared to male lawyers;

- Unequal benefits and other forms of compensation as compared to male lawyers;

- Unequal business development opportunities as compared to male lawyers; and

- Unequal opportunities for advancement including, but not limited to, promotion, as compared to male lawyers.

175.    The above conduct, as well as the conduct described below, resulted in subjecting women lawyers to lesser terms and conditions of employment at Moses Singer.

176.    Upon information and belief, Moses Singer subjected women lawyers at all levels to such unequal pay, including, but not limited to, law clerks, associates, of-counsels, and partners.

177.    This pay disparity was uncovered by members of the EPA Collective when a document disclosing the pay of many, if not all attorneys, at the firm was distributed internally after lawyers learned that it had been inadvertently shared.  On information, this document showed that women lawyers were paid less than male lawyers, and that even male lawyers junior to women lawyers were in instances paid more on account of their gender.

178.     Moses Singer's systemic discrimination against the EPA Collective is continuing in nature. The EPA Collective members were paid less and denied promotions and advancement at a greater rate by Moses Singer than the firm's similarly situated male lawyers, despite performing similar or the same work, working on many of the same cases, and having comparable or better experience and qualifications, whether quantitatively or qualitatively.

179.     Moses Singer's discrimination against Plaintiff and the EPA Collective results from common patterns, practices or policies, and acquiescence to and ratification of such patterns, practices, or policies. For example, Moses Singer's policy to dock working mothers' hours and pay for time missed due to maternity leaves for bonus and promotion calculations.

180.     The EPA Collective is readily ascertainable. The EPA Collective members' names and addresses are readily ascertainable from Moses Singer's records and files.

181.     Common questions of law and fact predominate with respect to Plaintiff and the EPA Collective, who worked in New York and were subject to substantially similar if not identical firm employment patterns, practices, and policies.

182.     Take the Super Lawyers Awards the firm boasted about this year, for example.

183.     Just three women at the firm were named to the 2023 New York Metro Super Lawyers list compared with 20 men; none of these women were part of the litigation department.

184.     Further, the female litigation attorneys who did appear on the 2023 Metro Rising Stars List reflect specialties like E-Discovery, while the male attorneys who receive nearly all prime Business and Commercial Litigation assignments at Moses Singer have their specialties reflected accordingly in the prime business development practice areas.

185.     Even so, Moses Singer touts its "Women's Initiative."

186.     Defendants brag on their website that there are "10 Women Partners" at Moses Singer.

187.     "10 Women Partners" partners would be bad enough, but there are actually nine, or fewer now, once Plaintiff is excluded from the count, out of 49 partners at the firm. Further, only three of these women partners are equity partners.

188.     The firm also boasts that the Management Committee is made up of just 33% women.[7]

189.     But the firm hides the fact that at least 70% of the "10 women partners" that it misleadingly claims to have (again, now one fewer after Ms. Daneshrad's termination) lack equity in the firm and can be stripped of their bonuses if they dare to take maternity or other protected leaves falling disproportionately on women.

190.     Contrast this figure with Moses Singer's "Diversity Committee Chairs," which are made up of 66% women and only 33% men, according to Defendants' website.

191.     Promoting diversity and inclusion falls disproportionately on women at the firm, while economic decision making at Moses Singer is dominated by men.

192.     Odd as it may be to brag about these abysmal figures, Moses Singer heartily pats itself on the back.

193.     Moses Singer boasts that it's Women's Initiative held "an event aimed at educating women about heart disease."

---

[7] https://www.mosessinger.com/firm-overview/diversity ("Advancement of Women. Among the Firm's attorneys are 10 women partners, including the Chairs of the Intellectual Property, Entertainment & Technology practice group, Healthcare & Life Sciences practice group, the Leader of the Law Firm Industry practice, and Leader of the Employee Benefits & Executive Compensation and Employment & Severance Agreement practices. Two women sit on the Firm's Management Committee.").

194.    Ms. Daneshrad and the EPA Collective at Moses Singer did not need to be lectured to about heart disease, they needed the firm to stop discriminating against them because they are women lawyers.

**FIRST CAUSE OF ACTION**
**Violations of the Equal Pay Act**
**(All Defendants)**
**(Individual and Collective Claims)**

195.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

196.    The claims brought here under the Equal Pay Act, 29 U.S.C. § 206 *et seq.*, are brought on behalf of Plaintiff and all members of the EPA Collective.

197.    During the period of the employment of Plaintiff and all members of the EPA Collective, Defendants were subject to the Equal Pay Act, 29 U.S.C. § 206 *et seq*. During that time, Defendants required Plaintiff and the members of the EPA Collective to perform the same or substantially the same job position as male lawyers, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff and the members of the EPA Collective at a rate of pay, including salary, equity, and bonus, less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

198.    By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. § 206 *et seq*.

199.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiff and the EPA Collective members have suffered,

and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

200.    Plaintiff and the members of the EPA Collective are further entitled to liquidated damages, reasonable costs, and attorneys' fees.

## SECOND CAUSE OF ACTION
### Interference in Violation of the FMLA
### (All Defendants)

201.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

202.    At all relevant times, Plaintiff was an "eligible employee" within the meaning of the Family Medical Leave Act, 29 U.S.C. § 2601, and Defendants were "covered employers."

203.    By the actions described above, Defendants violated the FMLA by unlawfully interfering with, restraining, or denying the exercise of Plaintiff's rights by requiring her to work during protected leaves, counting her time on protected leave against her for promotion and bonus calculation, and firing her upon return from protected leave, *inter alia*.

204.    As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff suffered and continues suffering harm for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

205.    Defendants' unlawful interference constitutes bad faith, malicious, willful, and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

## THIRD CAUSE OF ACTION
### Retaliation in Violation of the FMLA
### (All Defendants)

206.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

207.    At all relevant times, Plaintiff was an "eligible employee" within the meaning of the Family Medical Leave Act, 29 U.S.C. § 2601, and Defendants were "covered employers."

208.    By the actions described above, Defendants violated the FMLA by unlawfully retaliating against Plaintiff for exercising rights protected by the FMLA by withholding, restraining, or denying the exercise of Plaintiff's rights by, terminating her in retaliation for exercising her FMLA right to protected leave and subjecting her to an adverse employment action that would dissuade a reasonable person from exercising rights protected by the FMLA.

209.    As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff suffered and continues suffering harm for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

210.    Defendants' unlawful retaliation constitutes bad faith, malicious, willful, and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

### FOURTH CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL
### (All Defendants)

211.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

212.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYCHRL, by, *inter alia*, denying her the equal terms and conditions of employment because of her gender, sex, pregnancy status, caretaker status, disability status, failing to investigate her discrimination complaints, subjecting her to a hostile work environment, failing to provide a legally sufficient lactation room, failure to develop and implement a written policy about the provision of a lactation room, failure to distribute the above nonexistent written policy upon hiring, failure to provide written notice of Plaintiff's right to be

free from discrimination in relation to pregnancy, childbirth, and related medical conditions, and failing to accommodate Plaintiff's pregnancy.

213.    As a direct and proximate result of Defendants' unlawful actions in violation of NYCHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which she is entitled to an award of damages.

214.    Defendants' unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL
### (All Defendants)

215.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

216.    By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including, most recently, terminating her employment.

217.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

218.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

219.     Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### Aiding and Abetting in Violation of the NYCHRL
### (Defendants Swagert, Zimmerman, and Lackowitz)

220.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

221.     By the actions described above, Defendants knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

222.     As a direct and proximate result of Defendants unlawful actions in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

223.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

224.     Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### Discrimination in Violation of the NYSHRL

**(All Defendants)**

225.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

226.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL, by, *inter alia*, denying her the equal terms and conditions of employment because of her gender, sex, pregnancy status, caretaker status, disability status, failing to investigate her discrimination complaints, subjecting her to a hostile work environment, and failing to accommodate Plaintiff's pregnancy.

227.    As a direct and proximate result of Defendants unlawful actions in violation of NYSHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which she is entitled to an award of damages.

228.    Defendants' unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### Retaliation in Violation of the NYSHRL
**(All Defendants)**

229.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

230.    By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including, most recently, terminating her employment.

231.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

232.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

233.     Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### NINTH CAUSE OF ACTION
**Aiding and Abetting in Violation of the NYSHRL**
**(Against Defendants Swagert, Zimmerman, and Lackowitz)**

234.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

235.     By the actions described above, Defendants knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

236.     As a direct and proximate result of Defendants' unlawful actions in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

237.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

238.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**Violations of New York Labor Law Equal Pay Law**
**(All Defendants)**

239.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

240.    During Plaintiff's employment, Defendants were subject to the New York Pay Equity Law, New York Labor Law § 194 *et seq*.

241.    Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary, equity, and bonus, less than such male employees.

242.    The differential pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a bona fide factor other than gender, such as education, training, or experience.

243.    Defendants engaged in patterns, practices, and employment policies that discriminated against Plaintiff on the basis of her gender by paying her a lesser rate of pay, including salary, equity, and bonus, than that paid to male employees performing the same or

substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishment.

244.   By the actions described above, Defendants violated the NY Pay Equity Law.

245.   As a direct and proximate result of Defendants' unlawful conduct in violation of the NY Pay Equity Law, Plaintiff suffered and continues suffering harm for which she is entitled to an award of monetary damages and other relief.

246.   Plaintiff is further entitled to liquidated damages, reasonable costs, and attorneys' fees.

**ELEVENTH CAUSE OF ACTION**
**Violations of New York Labor Law 215**
**(All Defendants Excluding Defendant Roder)**

247.   Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

248.   During Plaintiff's employment, Defendants were subject to New York Labor Law § 215 *et seq*.

249.   Defendants violated NYLL 215 when they discharged, threatened, penalized, or in any other manner discriminated and retaliated against Plaintiff because she used legally protected absences pursuant to federal, local, or state law.

250.   Defendants' policies assess a demerit, occurrence, or deduction from an allotted bank of time which subjects or could subject Plaintiff to disciplinary action, including Plaintiff's failure to receive a promotion or her loss of pay. Defendants failed to promote Plaintiff and pay her bonuses because the protected leaves and sick time she took was counted against her for determining whether she met Defendants' billable hour quota.

251.    As a direct and proximate result of Defendants' unlawful policies and retaliation under NYLL 215, Plaintiff suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

Plaintiff is further entitled to liquidated damages, front pay, lost compensation and damages, costs, and reasonable attorneys' fees.

### TWELFTH CAUSE OF ACTION
### Violations of New York Labor Law 206-C
### (All Defendants)

252.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

253.    During Plaintiff's employment, Defendants were subject to New York Labor Law § 206-c.

254.    Defendants violated NYLL 206-C when they failed to provide the New York State written lactation room policy to Plaintiff.

255.    As a direct and proximate result of Defendants' violation of NYLL 206-C, Plaintiff suffered and continues to suffer harm for which she is entitled to an award of monetary damages and equitable relief.

256.    Plaintiff is further entitled to costs and reasonable attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the EPA Collective, demands judgment against Defendants, jointly and severally, in an amount to be determined at trial for the following relief:

A. a declaratory judgment that the actions, conduct, and practices of Defendants violated federal, state, and city laws;

38

B. an award of economic damages;

C. an award of compensatory damages;

D. an award of monetary damages for mental anguish and emotional distress;

E. an award of punitive damages;

F. an award of such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

G. an award of reasonable attorneys' fees, costs, and expenses of this action;

H. permanent equitable and injunctive relief; and

I. such other relief that the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Date: December 21, 2023
New York, NY

SEPPINNI LAW

*/s/ Shane Seppinni*
Shane Seppinni
40 Broad St., 7th Fl.
New York, NY 10004
(212) 859-5085
shane@seppinnilaw.com

*Counsel for Plaintiff and the
Proposed EPA Collective*